**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:08cv537**

| | | |
|---|---|---|
| **TAMMY G. TERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

_____

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary

Judgment [Doc. 9] and the Defendant's Motion for Judgment  on the

Pleadings [Doc. 11].

## I.    PROCEDURAL HISTORY

The Plaintiff Tammy G. Terry filed an application for disability insurance

benefits on October 20, 2005, alleging that she had become disabled as of

September 12, 2003.  [Transcript ("T.") 61].  The Plaintiff's application was

denied initially and on reconsideration.  [T. 42-44, 47-50].  A hearing was held

before Administrative Law Judge ("ALJ") Frank D. Armstrong on April 1, 2008.

[T. 254-300].  On June 19, 2008, the ALJ issued a decision denying the

Plaintiff benefits. [T. 12-19]. The Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 4-7]. The Plaintiff has exhausted all available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.    THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's

physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id. In this case, the ALJ's determination was made at the fifth step.

## IV.    FACTS AS STATED IN THE RECORD

The Plaintiff was 39 years old at the time of the ALJ's hearing. [T. 61, 254]. The Plaintiff is a high school graduate. [T. 258]. Her past relevant work includes eight years as a customer service representative. [T. 188]. She quit that job because pain was causing her to miss one to two days' work per

month.  Id.

Plaintiff testified that she has health insurance.

The earliest medical record in the transcript is dated five months after Plaintiff's date of onset.  On January 16, 2004, she visited Dr. Stephen Jones, primary care physician at Jones Family Practice, who noted a history of hypertension, proteinuria, and hyperlipidemia.  She was taking Celexa, a depression medication, and Monopril, an Ace inhibitor.  [T. 157].  On February 23, 2004,  physical exam results were all normal except for those consistent with the epigastric pain that was her presenting complaint.  Id.  Multiple gallstones were found on ultrasound.  [T. 163].

On December 9, 2004, Dr. Davis at Shelby Women's Clinic noted that Plaintiff showed no evidence of depression, anxiety or agitation.  Her extremities revealed no swelling, tenderness or varicosities.  Her muscle strength was 5/5, symmetrical.  She was diagnosed with hypertension and mild depression[1], and continued on Monopril and Celexa, to return in one year.  [T. 168].

She returned to her primary care physician on March 31, 2005 by which time she had diffuse myalgias of her elbows and back, but not knees.  On physical exam, trigger points were found in her back, knees and elbows.  She

---

[1]The inherent contradiction in the exam report is noted where the findings reflect "no evidence of depression," but the diagnosis includes "mild depression".  [T. 168].

was still taking Monopril and Celexa prescribed by Dr. Davis, and was diagnosed with possible fibromyalgia. [T. 158]. On April 14, 2005, she was prescribed Neurontin and referred for rheumatology evaluation regarding possible fibromyalgia with Dr. Payne. [T. 158].

On May 23, 2005, Plaintiff saw Dr. Payne for rheumatology evaluation. She reported a long history of widespread musculoskeletal pain, present daily and worsened with activity. The symptoms were nocturnal, and her sleep pattern was nonrestorative. She had no photosensitivity, little imflammation, and no swelling, redness or warmth in her joints. She had prominent fatigue, tension headaches, and prominent irritable bowel symptoms. Neurotonin caused GI upset. All of these symptoms and increased pain limit her activities. Her extensive lab workup was unremarkable. Treatment with anti-inflammatories and analgesics gave modest improvement. She was using Monopril 20 mg and Celexa 20 mg. [T. 176]. Her weight had remained stable over the past five years, and on exam there was no adverse respiratory, cardiac, or neurological sign, and no problems with swallowing, ulcers, heartburn, nausea, gallstones[2] or vomiting. She was found to have diffuse tender points of 1+ severity in all locations characteristic for fibromyalgia syndrome, to be moderately deconditioned, and to have no weakness or

---

[2]There was no notation as to what had become of the multiple gallstones found the prior year. [T. 163, 177].

atrophy. Fibromyalgia syndrome was diagnosed, and education along with a trial of Zanaflex was started. [T. 177]. By December 28, 2005, widespread pain and frequent headaches continued, and sleep was decreasing. She was trying to exercise when possible. Ultram (tramadol) and Flexeril were added to her existing medication, Monopril, Celexa and Zanaflex, which was increased. [T. 179].

On December 10, 2005, she was evaluated by the state agency. She reported that she had chronic pain, six on a scale of ten (6/10) on average, and headaches since four years ago. This fibromyalgia was originally identified as bursitis and treated without improvement. She has had no physical therapy. [T. 188]. The muscle relaxers she was taking did not always work. She limits her Ultram intake to one per day. She tries to get housework done, but what used to take one day now takes several days. For cooking, she heats up packaged food. Review of signs showed all normal findings except that "she hurts from head to toe, in her arms, back, shoulder, knees, heels and ankles", and had intermittent headaches. On physical exam, she had a depressed affect and made poor eye contact, but was neatly groomed. She had a congenitally short left forearm extending approximately 1 inch below the left elbow, with four miniscule digits about 1 centimeter each in length. She put on her jacket, socks and lace-up shoes without assistance.

She can move all of her left arm, and range of motion of extremities is intact with no limitation other than absent areas due to the deformity. Her gait and heel-toe walk were normal. She was tender anywhere that was touched with light palpation, and with flexion and extension of her knees bilaterally. [T. 190]. All reflexes were intact. Dr. Rhoe's functional assessment was that it was difficult to ascertain fibromyalgia's affect on Plaintiff since she was tender everywhere. It was recommended that she see a psychiatrist to maximize the benefits of her depression medication, and that she be followed by a primary care physician for her uncontrolled hypertension. [T. 191].

Christine Cooper, Ph.D. performed for the state agency a comprehensive clinical psychological evaluation of Plaintiff on March 17, 2006. She frequently shifted position throughout the interview, and stood frequently after 10 minutes of sitting. She was cooperative and answered questions fully. She reported her fibromyalgia pain as chronic, pretty severe every day, with intermittent fatigue. She has two to four bad days per week. Nausea is intermittent. She did not eat all day, to avoid diarrhea during this interview. The onset of depression accompanied the onset of fibromyalgia. She worries about everything, ruminates, feels helpless, hopeless, guity, and worthless. [T. 195]. It is difficult to fall sleep, and she gets one to two hours' sleep at a time. She has had no counseling or psychiatric hospitalizations;

her family doctor prescribes her psychotropic medications. At the time, her medications were Citalopram, Fosinopril, Tramadol, and Zanaflex. She had no problems in school, with relationships, or with maintaining employment. She performs her activities of daily living independently, other than zippers and hair drying. She keeps a permanent in order to avoid having to style her hair. Showering wears her out because of the arm lifting required; she has to go to bed afterward. [T. 196]. She naps from 7 to 10 a.m. She had curtailed activities that she had enjoyed. She can do about 30 minutes of chores at a time. The most physical things she does are mop and vaccuum, during which she takes breaks. She drives 50 minutes each way, once a week to see her parents. She hurt after shopping for 2 hours recently. She completed a 4-page questionnaire timely. Her mood was euthymic, affect broad, speech normal and coherent, and her memory, fund of information, attention and concentration, and judgment and insight were good. [T. 186]. She was noted at Axis I as having depressive disorder, NOS; this was elsewhere noted as mild. She had a GAF of 65. She is able to distract herself from her depressive symptoms, and is able to perform her duties and socialize. The symptoms would not hinder her in a work setting. [T. 187].

On February 15, 2006, she return to Dr. Davis. There was again no evidence of depression, anxiety or agitation. Again there was no tenderness

to palpation of extremities, and muscle strength was 5/5 and symmetrical. [T. 172] She was noted to have a work telephone number, to have a new diagnosis of fibromyalgia, and to be taking Monopril, Tramadol, Zanaflex, and Citalopran. [T. 173] She was diagnosed with hypertension, and prescribed Monopril. [T. 172].

On December 10, 2007, Plaintiff began treatment at the Carolina Chiropractic center for pain in the lumbar region, lower back, and pelvic region at the sacroiliac area [T. 199]. Plaintiff evaluated her pain as 5/10 [T. 199], but admitted "some relief" was obtained with the use of medication [T. 199.] Upon physical examination, Plaintiff's expressed moderate pain in the left lumbar region and the lower back and pelvis that were worsening [T. 200]. Plaintiff's grip strength was normal and her range of motion was "mild to moderately decreased" in the lumbar spine [T. 201]. Plaintiff's physician noted, "[t]he result of the chiropractic adjustment is expected to result in improvement of the patient's condition or to arrest the progression of or to slow the deterioration of the patient's condition" [T. 202].

On December 12, 2007, Plaintiff's pain and symptoms had diminished to 3/10. Medication was helping [T. 204]. Plaintiff was treated 3 more times in December. [T. 208-209, 210-211, 212-213] with similar complaints of pain. On December 27, 2007, Plaintiff's pain had reduced to 2/10 and she

described her pain as a "dull ache" [T. 214]. Her pain rating continued decreasing over time and ended at 1/10 on January 14, 2008 [T. 229]. Plaintiff continued with treatment at Carolina Chiropractic Plus and her pain remained well controlled with treatment until February 6, 2008, her last documented appointment of record [T. 231-243].

Plaintiff testified about details of her former job, indicating that she would enter information in to a computer when she was working and that she could use her left hand as a finger when she would type. [T. 261]. The ALJ then asked her what caused her to stop working. She answered, "I started having pain in my neck and shoulders and arms and back and everything and I just assumed it was from sitting at the desk all day. But I started having the pain and fatigue and headaches and everything else, so --" [T. 261]. The pain started after the birth of her daughter in 1999 and was gradual and then worsened in 2002. Plaintiff asked to be allowed to stand during the hearing. [T. 261-262]. She described how her pain worsened and spread to different parts of her body. She stated that when she worked except for trips to the bathroom she would have to sit and that due to the pain throughout her body she was not able to type. [T. 262-264]. She had recently started taking Celexa again for her depression. [T. 264-265]. Her daily routine involves bad days and better days. On a better day she will occasionally play a board game

with her daughter or go outside and watch her daughter play but that she cannot do any sports with her. She said she drives her daughter to school and helps her with homework. She attends church and takes turns reading stories to the Sunday School class. [T. 269-272]. She, her husband, and her daughter share the chores. As for cooking she said that she will open a can or a box of something or her husband will pick something up. She no longer does her hobby of painting. She said that she has a lightweight vacuum with which she does one room in a day. [T. 272-273[. Her left arm can only be used as a helper and that she is not able to pick anything up with the small fingers on her left arm. She is restricted to an automatic transmission but that she has no restrictions on her driver's license. [T. 276-277]. The number of times she will have to lay down during the day will vary from once or twice to the majority of the day. She went on to say that when she does lay down it will be for at least 30 minutes and then may have to lay back down after being up 10 minutes. [T. 280-281]. When she was working she was missing a day at least every other week and that in one month she would miss four or five days. She further stated that she was written up for possible termination due to her absences. [T. 281].

Plaintiff's husband testified that since 2002, he has observed her to have increasing difficulty; she moves in the morning like a person in her

seventies. He and their daughter had to do many of the chores, and he had to do all of the heavy lifting, such as dog food, bottled water, drinks, anything that weighs "maybe more than five or so pounds". [T. 293-4]. Any physical task, such as vacuuming, that she does for more than five or ten minutes, causes her to lay down and bothers her the next day. [T. 294].

## V.    THE ALJ'S DECISION

On June 19, 2008, the ALJ issued a decision denying the Plaintiff's claim. [T. 12-19]. Proceeding to the sequential evaluation, the ALJ found that the Plaintiff's date last insured (DLI) was December 31, 2008 and that she had not engaged in any substantial gainful activity since her alleged onset date of September 12, 2003. [T. 14]. The ALJ then found that the medical evidence established fibromyagia, hypertension and mood disorder as severe impairments. [T. 14]. The ALJ then determined that none of Plaintiff's impairments met or equaled a listing. [T. 15]. The ALJ assessed the Plaintiff's residual functional capacity (RFC), finding that she could perform the full range of light work. [T. 16]. From these, he determined that Plaintiff could return to her past relevant work as a customer service representative, which does not require the performance of activities precluded by her RFC. [T. 19]. Accordingly, the ALJ concluded that the Plaintiff was not "disabled" as defined

by the Social Security Act from the alleged onset date of September 12, 2003. [T. 19].

## VI.    DISCUSSION

Plaintiff raises five assignments of error:  The ALJ erred in (A) assessing her past relevant work as required by SSR 82-62;  (B) failing to comply with 96-8p and finding that she could return to her past relevant work (C) failing to evaluate Plaintiff's mental impairment and resulting functional limitations as required by 20 C.F.R. § 404.1520a; (D) failing to follow SSR 86-6; (E) failing to fully develop the record and inquire about conflicts between the vocational expert's testimony and the DOT, as required by SSR 00-4p.

These will be addressed *seriatim*.

## A.    The ALJ's failure to comply with aspects of SSR 82-62 was harmless error.

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). She must make a prima facie showing of disability by showing she is unable to return to her past relevant work. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir.1983).

Plaintiff argues that the ALJ's two-sentence discussion supporting his conclusion that she can do her past work as a customer service representative fails to meet the mandate of SSR 82-62p. As Plaintiff indicates, SSR 82-62 provides,

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit. SSR 82-62 at *3.

Plaintiff asserts that this duty to document the past work analysis comprises the second phase of a step four analysis. Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996).

At hearing, the ALJ did obtain detailed information about the job duties, those that were specific to her job from Plaintiff's disability application and hearing testimony [T. 259-261] and a minimal statement of those applying to the job as performed in the national economy from the vocational expert [T. 296]. There being no inconsistencies between Plaintiff's and the vocational expert's testimony, reliance on these without having to restate them in full in his opinion is within the ALJ's prerogative, and fulfills the dictates of 82-62p. At the hearing, Plaintiff asked no questions of the vocational expert, and

otherwise raised no issue with the ALJ's reliance on his testimony on this issue.

The evidence on which the ALJ relied, however, contained no indication of the mental demands of Plaintiff's former job, which is required when a mental impairment has been found. SSR 82-62 at *4. The Court is aware that several recent cases in this circuit have been remanded for such an error. Harris v. Secretary, Dept. of Health and Human Services, 866 F.2d 1415 (4th Cir. 1989); Osgood v. Astrue, Slip Copy, 2010 WL 737839 (D.S.C.,2010); Robinson v. Astrue, Slip Copy, 2010 WL 619282 (D.S.C.,2010). However, Plaintiff does not show, and the Court does not find, prejudice to this Plaintiff from this error. Plaintiff's medical evidence is slim; for example, she has had no mental health counseling whatsoever, and insufficient treatment with medications. Her evidence provides little support for a finding of a mental impairment, much less a disabling one. Had the ALJ discussed the mental demands and found Plaintiff unable to perform the mental demands of jobs within her RFC, such would not have been supported by the record. The RFC determined earlier in the five-step sequential evaluation, the full range of light work, subsumes the characteristics of Plaintiff's past work as assessed by the vocational expert, namely, light semi-skilled work at SVP 3. The Court seeing, and the Plaintiff noting, no inconsistency between the job as done by Plaintiff

and the job as done in the national economy, no different outcome would have resulted from the ALJ's elaborating on the mental demands of her past work.

An error that had no practical effect on the outcome of the case is not cause for reversing the Commissioner's decision. DeWalt v. Astrue, 2009 WL 5125208 (D.S.C.,2009), citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir.1987).

**B.    The ALJ properly evaluated Plaintiff's RFC and past relevant work under 96-8p.**

Plaintiff asserts that the ALJ did not consider the following in his assessment of her residual functional capacity:  (1) the affects of her mood disorder, (2) the fact that during her evaluation with Dr. Cooper she frequently shifted position, stood after about 10 minutes' sitting, and paced, and (3) that since December 2005, her "physical debility appears worse." [Doc. 10-17].

SSR 96-8p emphasizes that, "1. [ ] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.  2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p at *1.  The RFC assessment must be based on all of the relevant

evidence in the case record.  Id. at *5.

It is the latter dictate upon which Plaintiff's argument rests.  That argument, however, takes SSR 96-8p too literally, and fails to account for the fact that Plaintiff retains the burden of proof at step 4.  Mellon v. Astrue, 2009 WL 2777653 (D.S.C.,2009); *see also*, Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The ALJ recited from Plaintiff's testimony about her congenital deformity, her gradually increasing pain, fatigue, and headaches, her high blood pressure and depression, medications, and daily activities.  [T. 17].  He found her testimony about the intensity, persistence and limiting effects of symptoms not credible due to their inconsistency with the RFC.  The RFC was developed from medical evidence repeatedly showing symmetrical 5/5 muscle strength, normal gait, station and range of motion, and the tendency of her pain to respond to medication.  [T. 18].

From among Plaintiff's psychological evaluations, some by examining and some by non-examining providers, the ALJ relied upon that of the examining doctor, Dr. Cooper, dated March 17, 2006.  [T. 194-198].  This choice complied with guidelines for evaluating medical opinions regarding impairments and disability set out in regulation 20 C.F.R. § 404.1527.  Further, That evaluation is more favorable to Plaintiff than some of the other

evaluations in evidence, and most reflective of the longitudinal record, one that, again, features no mental health treatment records.

The objective evidence that Plaintiff offered to meet her burden of proof supports the ALJ's RFC assessment, and did not display specific or severe enough limitations to merit a different RFC.

As to the specific items Plaintiff claims went unaddressed, Plaintiff points out no specific evidence of limitations arising from the mood disorder, either in medical records or in Plaintiff's testimony, and the Court finds none. That argument must fail. Both of the other two items, Dr. Cooper's notations that "she frequently shifted her position throughout the interview, and stood up frequently" [T. 194] and that "her physical debility appears worse" [T. 198] are entitled to little weight because they are general observations, not medical opinions. 20 C.F.R. § 404.1527(d)(2), Bass v. McMahon, 499 F.3d 506, 510 (6th Cir. 2007). The ALJ does not bear the "impossible burden of mentioning every piece of evidence" in the record. Parks v. Sullivan, 766 F.Supp. 627, 635 (N.D. Ill. 1991). Plaintiff has not displayed why the latter two mentioned notations are sufficiently significant to require mention in the ALJ's decision.

It is also noted that failure to make specific function by function findings for RFC is not error requiring remand where an ALJ has properly assessed the RFC. Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). As the

Court pointed out in <u>Warner v. Barnhart</u>, Civil No. 1:04CV00714, slip op. at 12 (M.D.N.C. Sept. 16, 2005), a remand requiring the ALJ to make further findings as to specific functional capacities [can be] "clearly a pointless exercise which is wasteful of the Commissioner's (and ultimately this Court's) resources."  On the evidence of record here, this is such a case.

**C.    The ALJ's evaluation of Plaintiff's mental impairment was harmless error.**

"When a claimant alleges disability due to a mental condition, the Commissioner must follow a special technique set forth in 20 C.F.R. §404.1520a and the Listing of Impairments[.]" <u>Waters v. Astrue</u>, 495 F.Supp.2d 512, 515 (D.Md. 2007) (emphasis in original).  In applying that technique, first, the ALJ is to evaluate the symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. §404.1520a(b).  The next step requires the ALJ to rate the degree of functional limitation resulting from the mental impairment in four functional areas: daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.   20 C.F.R. §404.1520a(c)(3).  The ALJ is obligated to rate the degrees of limitation in the first three areas by using a five point scale: none, mild, moderate, marked and extreme.  20 C.F.R. §404.1520a(c)(4).  As to the last area, he is obligated to use a scale consisting of: "none," "one or two," "three," or "four or more."  Id.

Plaintiff argues that because the ALJ found, when applying the first step, that Plaintiff had a severe mental impairment, he was compelled to find in like manner at the second step. Plaintiff is incorrect.

First, the severity finding was not compelled by the evidence. The State Agency's Psychiatric Review Technique prepared on December 28, 2005 used information of record, including Dr. Cooper's evaluation, to determine that Plaintiff's affective disorder under Listing 12.04, consisting of depressive disorder not otherwise specified, was not severe. [T. 122]. This assessment was confirmed 3 months later by another State Agency case reviewer who considered newer information. [T. 137]. Plaintiff has had no counseling, hospitalization, or other ongoing treatment by a mental health professional for her alleged impairments at any time; only assessments specific to the determination of a disability. She has had some medication for her mental impairments prescribed by her primary care physician, but there is no diagnostic evidence of record nor, apparently, efforts to make sure these were maximized for therapeutic effect.

Second, Plaintiff cites no authority for the proposition that a step 2 finding of severity compels a step 4 finding that the severe impairment necessarily imposes "marked" limitations in the three functional areas and four or more episodes of decompensation in the fourth area. In the five step evaluation process, each step represents a separate and independent

analysis.  Though successfully meeting one's burden of proof at one step does dictate the ALJ's performance of the analysis at the next step,[3] it does not dictate the outcome of that distinct analysis and certainly does not dictate the outcome at subsequent distinct steps in the sequence.

At step 3, the ALJ determined that Plaintiff's mental impairment does not meet a Listing, properly discussing the "B" and "C" criteria as identified within the applicable Listing.  None of the psychological evaluations performed for the Plaintiff suggests symptoms with severity  that is remotely close to Listing level.  Plaintiff has had no mental health treatment.  These constitute substantial evidence for the ALJ's conclusion that her mental impairment does not meet a Listing.

At step 4, the ALJ discussed mental impairment evidence under the four functional areas.  Dr. Cooper's evaluation prepared on December 2, 2005 evaluated those functional areas in narrative fashion:  she was able to distract herself from pain and perform ADLs; she could conform to social standards, interact with peers, and cooperate with authority figures at work; she could sustain attention to perform simple repetitive tasks; and she had experienced no periods of decompensation.  [T. 187,  184].  A second State Agency

---

[3] "If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step."  20 C.F.R. 404.1520(a)(4).

Psychiatric Review Technique was prepared on May 2, 2006. Her affective disorder then consisted of major depression, and under the "B" criteria it was noted as causing moderate limitations on ADLs, social functioning, and concentration, persistence and pace. [T. 142, 149]. The mental RFC assessment performed the same day showed 7 areas of moderate limitation, but no areas of marked limitation. The conclusion was that "claimant should be able to do simple, routine tasks within the limitations noted above." [T. 155].

The Secretary has provided guidelines for evaluating medical opinions regarding impairments and disability in regulation 20 C.F.R. § 404.1527. These ask the fact-finder to weigh:

> (1) the examining relationship (more weight to an examining than a non-examining physician); (2) the treating relationship (more weight to treating than consultative sources); (3) supportability (whether the report is based on detailed findings or merely conclusory); (4) consistency (internally and compared to the record as a whole); (5) specialization (whether the source is board certified or whose qualifications are suspect); and (6) "other factors" (unspecified). *See* <u>Vest v. Astrue</u>, 2009 WL 899418, (S.D.W.Va. 2009) at *5.

This is precisely what the ALJ did in this case. Moreover, under these rules, the psychological evaluation obtained privately in March 2008 is entitled to little weight: it was the product of a one-time visit rather than a treating relationship, was prepared by a less-credentialed person than the earlier

evaluations were, suggests disorder diagnoses that are not consistent with the medical records as a whole, and fails to address the "B" criteria for step 2 evaluation or any limitations on work activity sufficient for assessing a mental RFC at step 4. Finally, it invades the province of the ALJ by opining on the ultimate issue of disability. Even "[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *See* <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir.2002); 20 C.F.R. 404.1527(e). The ALJ is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. CFR § 404.1527(f)(2)(I) and 416.927(f)(2)(I).

The ALJ's evaluation of Plaintiff's mental impairment followed applicable law, and his findings were supported by substantial evidence. Therefore, this assignment of error is overruled.

**(D) The ALJ made no error relative to SSR 86-6 or 86-8p.**

Preliminarily the Court notes that Plaintiff erroneously cited a non-existent Ruling, SSR 86-6. Other context suggests that Plaintiff meant 86-8p, and this discussion is based on that conclusion.

Social Security Ruling 86-8p offers clarification of the five-step sequential evaluation process that all ALJs must follow in formulating their

disability decisions.  SSR 86-8p at *1.  It sets general boundaries for evidence-based decisions with this admonition:

> The rationale must reflect the sequential evaluation process; describe the weight attributed to the pertinent medical, nonmedical and vocational factors in the case; and reconcile any significant inconsistencies. Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence. Id. at *8.

Without pointing to any presumption, speculation, or supposition, Plaintiff claims that such "clear[ly]" were made and formed the ALJ's asserted error here.  The Court finds only evidence-based findings of fact in the ALJ's decision.  As Defendant notes, "Plaintiff has 'an obligation to spell out the argument squarely and distinctly.'" Alston v. Apfel, No. 98-2001, 1999 WL 529516, at **1 (1st Cir. 1999), citing U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones").  For these reasons, this argument of the Plaintiff must fail.

## (E)  The ALJ complied with SSR 00-4p.

Plaintiff argues that the ALJ erred at step five by not asking for the DOT numbers for the jobs the VE testified about, asserting that this constitutes a conflict between VE testimony and the DOT.

Social Security Ruling 00-4p, on which Plaintiff relies, governs how an

ALJ may use VE testimony:

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. Id. at *4. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified. SSR 00-4p at *4.

[W]e rely primarily on the DOT (including its companion publication,

the SCO) for information about the requirements of work in the national

economy. Id. at *2. The regulations at 20 CFR 404.1566(d) and

416.966(d) provide that we will take administrative notice of "reliable job

information" available from various publications, including the DOT. Id.

It seems clear from the history of SSR 00-4p and cases interpreting it

that not every discrepancy was meant to be deemed a conflict that must be

resolved under its terms. Courts have declined to hold definitively that a

SSR 00-4p qualifying conflict is presented by an VE's failure to state a DOT

code that corresponds to a job testified about (as this VE has done) or by

a VE's mis-stating a DOT code that corresponds to a job. Fisher v.

Barnhart, 181 Fed.Appx. 359 at *8, (4th Cir. 2006). *See also*, Pryor v.

Astrue, 650 F.Supp.2d 493 (W.D.Va.,2009). More substantive conflicts are

what the Ruling is intended to address.

Here, the ALJ admonished the VE to alert him to any conflicts between his testimony and the DOT, and the VE agreed to comply. The mere failure to give DOT numbers does not constitute remandable error, and the ALJ's reliance on the VE testimony was supported by substantial evidence.

## VII.  CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards and that there is substantial evidence to support the ALJ's finding of no disability from the date of onset to the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 9] is **DENIED**; the Defendant's Motion for Judgment on the Pleadings [Doc. 11] is **GRANTED**; and the Commissioner's decision is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: June 23, 2010

Martin Reidinger
United States District Judge